**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

G.M., a minor, by his parents and next friends,
E.P. and G.R.M.

and

E.P.

and

G.R.M.

Civil Action No. _____

       Plaintiffs,

       v.

DR. MICHAEL J. MARTIRANO
Howard County Public Schools
10910 Clarksville Pike
Ellicott City, MD 21042

and

HOWARD COUNTY BOARD OF EDUCATION
10910 Clarksville Pike
Ellicott City, MD 21042

       Defendants.

**COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

**<u>Preliminary Statement</u>**

1.      This is an action brought by E.P. and G.R.M. ("the parents"), in their

own right and on behalf of their son, G.M., alleging that Howard County Public School

System ("HCPS" or the "school system"), failed to find G.M. eligible for special

education and related services under the Individuals With Disabilities Education

Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.* In addition, the Administrative

Law Judge ("ALJ"), in this action compounded the violation by committing numerous

additional violations of the IDEA and its Due Process of law protections. These

violations included rejecting the parents' witnesses and by giving complete deference to

the school system witnesses. The ALJ also ignored critical evidence in support of the

parents' position without justification or reason, including countervailing evidence in

the written records produced by HCPS. Accordingly, the ALJ denied the parents their

requested relief of funding and placement at the Jemicy School. For any of these errors,

the Court should reverse the ALJ's Decision.

## Jurisdiction

2.      This Court has jurisdiction pursuant to the Individuals with Disabilities

Education Improvement Act ("IDEA"), 20 U.S.C. §§ 1400 *et seq.*; the Rehabilitation

Act of 1973 ("Section 504"), 29 U.S.C. § 794; 42 U.S.C. § 1983 ("Section 1983"); and

28 U.S.C. §§ 1331 and 1343. Declaratory relief is authorized by 28 U.S.C. §§ 2201 and

2202. This Court has pendent jurisdiction pursuant to MD. CODE ANN. EDUC. § 8-413.

Plaintiffs have exhausted their administrative remedies and appeal from a decision of an

Administrative Law Judge of the Maryland Office of Administrative Hearings, MSDE-

HOWD-OT-19-22166 (December 26, 2019).

## Parties

3.      G.M. is a nine-year-old student who has been denied eligibility for

special education and related services under the IDEA. At all times relevant to this

action, he resided in Howard County, Maryland.  His parents, E.P. and G.R.M., bring

this action on G.M.'s behalf and in their own right.

4.       Dr. Michael J. Martirano is the Superintendent of HCPS, and as such, is

the public official charged with the responsibility for ensuring that HCPS complies with

federal law as to the identification and education of disabled children.  He is sued in his

official capacity.

5.       The Howard County Board of Education receives financial assistance

from the United States Department of Education.  The Howard County Board of

Education is responsible for complying with federal law with respect to the

identification of disabled students and provision of FAPE to each disabled child in

Howard County under the IDEA.

## Factual Allegations

### General Background

6.       G.M. is a nine-year-old boy.

7.       In January, 2018, Dr. Julie Morrison, Psy.D. ("Dr. Morrison"), an

independent Licensed Clinical Psychologist, diagnosed G.M. with a specific learning

disability (dyslexia[1]), and a disorder of written expression (dysgraphia[2]).

---

[1] "Dyslexia:  According to the International Dyslexia Association, dyslexia is a specific learning disability that is neurobiological in origin.  It is characterized by difficulties with accurate and/or fluent word recognition and by poor spelling and decoding abilities.  These difficulties typically result from a deficit in the phonological component of language that is often unexpected in relation to other cognitive abilities and the provision of effective classroom instruction.  Secondary consequences may include problems in reading comprehension and reduced reading experience that can impede growth of vocabulary and background knowledge."

[2] "Dysgraphia:  A neurologically based specific learning disability, dysgraphia can present as difficulties with spelling, poor handwriting, and trouble putting thoughts on paper.  It can be a language based and/or non-language based disorder.  When it is language based, a student may have difficulty converting the sounds of language into written form, or knowing which alternate spelling to use for each sound.  When it is non-language based, a student

8.　　Dr. Morrison administered the Wechsler Intelligence Scale for Children, Fifth Edition, to establish G.M.'s intelligence quotient ("IQ").

9.　　Dr. Morrison reported that G.M. was in 77th percentile, which placed him in the high average range for IQ and cognitive ability, although a weakness in working memory was indicated.

10.　　In February, 2018, Deena Seifert, M.S., CCC-SLP ("Ms. Seifert"), an independent speech-language pathologist, diagnosed G.M. with a mixed receptive and expressive language disorder and an articulation disorder.

11.　　In April, 2018, Mary Nalepa, Ed.S. ("Ms. Nalepa"), HCPS psychologist, diagnosed G.M. with Attention Deficit Hyperactivity Disorder ("ADHD").

12.　　In May, 2018, Denise Taylor, M.S., CCC-SLP, an HCPS speech-language pathologist, found that G.M. exhibited dysfluencies and language formulation issues.

13.　　G.M. has a complex combination of Specific Learning Disabilities and Other Health Impairments, which requires differentiated, remedial approaches to learning.

14.　　G.M.'s disabilities impair his ability in reading, writing, processing language quickly (often referred to as rapid automatic naming, which also impacts G.M.'s ability to perform math calculation), and spoken language.

15.　　According to the Maryland State Department of Education, specialized instruction for students with dyslexia may include evidence-based interventions such as structured literacy instruction.

---

may have difficulty performing the controlled fine motor skills required to write.  Students with dysgraphia may speak more easily and fluently than they write."

16.     Orton Gillingham is an evidence-based reading intervention, and therefore considered specially designed instruction by the State of Maryland.

**Kindergarten-Second Grade at Centennial Lane Elementary School ("CLES")**

17.     G.M. started as a Kindergartner in CLES at age five (5).

18.     G.M.'s report cards throughout his time at CLES have consistently contained teacher notes that he fidgets, is easily distracted and inattentive, does not follow instructions, and has difficulty completing tasks.

19.     In Kindergarten, G.M.'s teacher, Lisa Cramer ("Ms. Cramer") noted on his report card that G.M. was still working on a very wide number of classroom-based problems, including raising his hand, impulse control, keeping his hands and feet to himself, having difficulty completing tasks in a timely manner, using his neatest writing/coloring, controlling outbursts, controlling his hands, fidgeting and making noise, not listening, using capital letters in the middle of sentences, misreading high frequency words, distractibility that interferes with his ability to get 1 sentence written down, self-control, and being attentive.

20.     G.M.'s parents worked with Ms. Cramer to address some of the attention issues, using a daily communication log.

21.     In first grade, before Back-to-School Night, Arthurlea Parham ("Ms. Parham"), had already expressed concerns regarding attention issue and G.M.'s parents worked with her on a weekly communication log to try to help from home.

22.     G.M.'s teacher, Ms. Parham, and math teacher, Mrs. Brown, noted on his report card that G.M. was still working on an even larger number of challenges including a lack of confidence, needing 1:1 prompts to assist with his efforts to write, math fluency, off-

task behavior, inattention, rushing and not paying attention to detail for spelling, grammar and punctuation, focus on written tasks, being attentive to his work, easily being distracted and needing redirection often, frequently needing repetition of directions and reminders to remain on task and attentive, help organizing his procedures for getting started, losing focus, struggling to get started with writing tasks, struggling with word choices, writing legibly, not reviewing his work for spelling, punctuation and capitalization errors, losing meaning within his writing project due to errors in grammar and spelling.

23.     At the end of the year, Mrs. Parham stated on G.M.'s report card that, "Writing has been a challenge." P-5-2; Tr. at 158-59, 1199.

24.     In first grade, G.M.'s parents noticed that their ordinarily confident son lacked the confidence to write and when he had homework that involved reading or writing, he would cry or refuse to do the work. He could take hours trying to figure out how to write the short sentences while asking his parents to spell the words for him.

25.     By the second grade, G.M.'s parents clearly recognized he was struggling to read and even more so, to write.

26.     At home, G.M.'s parents noticed that he was resistant to reading and writing and that he lacked confidence; he would not attempt to write unless his parents spelled the words for him.

27.     In the beginning of second grade, G.M.'s mother, E.P., formerly E.M. ("Ms. P" or "mother"), met with his teacher, Rachael Clark ("Ms. Clark"), to discuss her concerns that G.M. may have an attention disorder.

28.     Ms. Clark informed Ms. P that G.M. was at least six months behind in reading.

29.     Ms. P expressed concern to Ms. Clark that G.M. may have dyslexia because of his resistance to reading and writing at home and his writing samples contained letter and number reversals, many misspellings and were illegible, but Ms. Clark said she was not concerned about dyslexia.  Ms. Clark did encourage his mother to request that HCPS test G.M. for an attention disorder.

30.     In first and second grade, G.M. was administered the Measures of Academic Progress ("MAP"), in reading and mathematics.  One purpose of the test is to help determine a student's progress.

31.     In first grade, G.M.'s Measures of Academic Progress ("MAP"), test scores were in the 71st percentile for Reading and the 99th percentile for Math.

32.     In second grade, G.M.'s scores on the MAP test dropped precipitously to the 38th percentile for Reading and to the 53rd percentile in Math.

33.     In the 1st Quarter of second grade, G.M.'s teachers noted on his report card that he had trouble listening to directions, sitting still, staying quiet in class, demonstrating organizational skills, attention, work completion, and inconsistencies in reading and writing.

**The November 15, 2017 IEP Meeting**

34.     On October 19, 2017, G.M.'s mother and father, requested that HCPS test G.M. for an attention disorder and learning disabilities.

35.     G.M.'s language arts teacher, Ms. Clark, and math teacher, Megan Monfrida ("Ms. Monfrida"), each completed a Teacher Input for the Initial Referral.

36.     Ms. Clark selected as areas of concern: Reading, including basic skills and reading fluency, Written Expression, including spelling, mechanics of writing, and organizing sentences ideas into paragraphs, and Attention/Learning Behaviors, including

sustaining attention, distractibility, organization, turning in assignments, losing or forgetting work or materials, completing class assignments, and participating in class.

37.     Ms. Monfrida selected areas of concern in Attention/Learning Behaviors, including sustaining attention, distractibility, and completing class assignments and Social/Emotional, including self-control.

38.     On November 8, 2017, Kate Mason ("Ms. Mason"), an HCPS IEP team coordinator, emailed G.M.'s parents a Data Summary but did not provide any work samples or other information to G.M.'s parents.

39.     HCPS uses the Fountas & Pinnell Benchmark Assessment System ("F&P"), which is a leveled reading assessment program that equates to grade level and is used to determine students' independent level, which is the level at which the student can read without assistance, and the student's instructional level, which is the level at which the teacher will provide instruction.

40.     According to F&P's scoring guide, by the end of first grade, students should have an oral reading rate of 75-100 words per minute and by the end of second grade, they should have an oral reading rate of 100-120.

41.     On November 15, 2017, HCPS held an IEP Meeting and denied G.M.'s parents' request for testing for an attention disorder or learning disabilities.

42.     CLES principal, Amanda Wadsworth ("Ms. Wadsworth"), stated that if she had to test all of the children who exhibited symptoms of inattentiveness, she would have to provide testing for approximately ten percent (10%) of the students and the school did not have the resources.

43.     Ms. Wadsworth stated that HCPS guidelines provided that students must be

at least one full year behind to qualify for testing in denying G.M.'s parents' request for testing.

44.     As of the date of this IEP Meeting, three months into second grade, G.M.'s highest recorded reading rate was 49 wpm, well below the expectations for first grade; however, this information was never provided to G.M.'s parents.

45.     The IEP Team told G.M.'s parents to follow up with their pediatrician about their concerns about G.M.'s issues with attention.

**Independent Comprehensive Psychological Evaluation**

46.     The family hired Dr. Morrison to evaluate G.M. on December 14 and 19, 2017.

47.     Dr. Morrison diagnosed G.M. with a Specific Reading Disorder, namely dyslexia, finding that G.M.'s phonological awareness (14th percentile), blending (9th percentile), and manipulating (9th percentile), were far below average, and his rapid digit naming and letter naming were below average (both 16th percentile).  While his reading of real words was average, G.M.'s decoding of non-real words was well below average (5th percentile); errors involved insertion, omission, and substitution of consonants and vowels; he engaged in whole word guessing and confused b/d and b/p; and he had problems sequencing sounds.  P-13.

48.     Dr. Morrison also diagnosed G.M. with a Disorder of Written Expression, namely dysgraphia, finding G.M. was on the lowest end of the average range for alphabet writing fluency but average for spelling. While he earned average scores for combining sentences, G.M. exhibited many errors, such as punctuation, capitalization, misuse of pronouns, incomplete sentences, misuse and confusion of words and homonyms. G.M.

corrected letter reversals, many of which appeared in his samples from school. P-13.

49.     Dr. Morrison also suspected a Language Disorder and recommended testing by a speech/language pathologist, finding that G.M.'s receptive vocabulary was in the superior range (96th percentile), while his expressive vocabulary was below average (21st percentile)—a 75 point differential. Dr. Morrison also found that G.M. had some trouble with word retrieval and providing the wrong part of speech, that he did not retell stories in sequence, and that he knew more than he was able to convey through oral expression.

50.     Though strongly suspected, Dr. Morrison's findings were inconclusive for an attention disorder.

51.     Dr. Morrison further found that executive dysfunction in initiation, planning, organization, working memory and task monitoring were apparent and made it difficult for G.M. to follow routines for handing in assignments, managing materials, maintaining a neat desk, and completing his work. Dr. Morrison also noted that language processing weaknesses can exacerbate these issues.

52.     Dr. Morrison recommended that G.M.'s parents attempt to remediate these learning disorders for a year before re-testing for an attention disorder.

53.     On January 16, 2018, Ms. P provided HCPS with a copy of the Psychological Evaluation and requested an IEP meeting to discuss the results and the services recommended by Dr. Morrison.

54.     On January 22, 2018, the parents began providing G.M. with private tutoring twice a week with Alissa Sheinbach, a tutor trained in Orton-Gillingham ("OG"), at a total cost of $160 per week from January through June, 2018.

**HCPS Review of Dr. Morrison Report and IEP Meeting: February 13, 2018**

55.     On February 13, 2018, an IEP Meeting was held to discuss Dr. Morrison's findings and recommendations.

56.     Dr. Morrison's report was considered by the IEP team, attached to the IEP documentation, and incorporated into G.M.'s record.

57.     Dr. Morrison recommended special education services throughout the school day in the form of a language-based, multi-sensory intervention, such as Orton-Gillingham, to improve blending and manipulating sounds in words as well as additional recommendations regarding specialized instruction, accommodations and assistive technology; G.M.'s parents requested that her recommendations be provided to G.M.

58.     During the IEP Meetings, HCPS discussed G.M.'s instructional reading level, or the level at which G.M. can read without any support.

59.     The F&P data shows that G.M. did not advance in his reading instructional level for approximately ten months and was not making academic progress.

60.     CLES responded that a student only qualifies for specialized instruction if the student is more than one full year behind in one or more of the categories on the SLD Supplement.

61.     As of the date of this IEP Meeting, five months into his second grade school year, G.M.'s highest recorded reading rate was 57 wpm, well below the expectations for first grade; however, this information was not provided to G.M.'s parents or discussed at any meeting.

62.     G.M.'s 2nd Quarter report card noted he was still working on fluency; struggling to complete written assignments even with extended time; attention; needing reminders to listen, not play with supplies or clothes; adhering to hallway rules;

organization; accuracy; precision; multi-step problems; and self-control.

63. Dr. Morrison recommended that G.M. be tested by a speech/language pathologist for a suspected language disorder based on the 75-point disparity between G.M.'s receptive and expressive language scores.

64. After denying the testing recommended by Dr. Morrison, the school-based IEP team insisted on more testing for an attention disorder, against Dr. Morrison's medical advice and after denying G.M.'s parents' previous request for ADHD testing.

65. HCPS also stated that it needed more phonological awareness testing in order to determine G.M.'s eligibility for services.

## Public Information Act Request

### Request for G.M.'s Education Records under FERPA

66. On March 21, 2018, Ms. P requested a copy of all of G.M.'s education records, pursuant to the Family Educational Rights and Privacy Act ("FERPA").

67. On March 27, 2018 and April 16, 2018, Kelly Russo, Resource Teacher for Nonpublic Services and Special Education Compliance, responded, stating that HCPS would charge a fee for Ms. P to receive copies of her son's education records.

68. In response to her FERPA request, Ms. P received information from registration at CLES, G.M.'s report cards, IEP meeting notes and referral forms, her letters in response to the IEP meeting notes, psychological and speech-language assessment reports, time on task observations from Ms. Nalepa, and copy of the parental rights notice.

### Comprehensive Independent Speech-Language Evaluation

69. Because HCPS denied G.M.'s parents' request for testing, Ms. P hired Ms. Seifert, an independent speech/language pathologist, to perform an educational evaluation

on February 19, 2018.

70.     Ms. P provided the results of Ms, Seifert's testing to HCPS.

71.     Ms. Seifert confirmed Dr. Morrison's suspicions of a language disorder and diagnosed G.M. with a Mixed Receptive/Expressive Language Disorder and an Articulation Disorder, finding a discrepancy between G.M.'s expressive and receptive language; that, "[o]verall there is a gap between what words G.M. knows (receptive) and what he is able to state (expressive)"; that, "[h]e had difficulty expressing the meanings of words he knows demonstrating poor performance"; that he had difficulty with word retrieval; and that he was in the 5th percentile for Oral Vocabulary.

72.     Ms. Seifert's assessment for language formulation (oral expression), found that "G.M. exhibited verbal formulation difficulties at all levels of demand: describing, explaining, and narrative skills."  G.M.'s ability to explain an event was, "below the level of expectations for his age."  When asked to generate a narrative using pictures, G.M. performed in the average range, but Ms. Seifert noted that, "his stories were sparse, lacking a plot, details, and an explanation of the roles of the characters."  G.M. also had difficulty explaining a familiar narrative, the Three Little Pigs, leaving out the beginning of the story, the details, and telling the story in a choppy manner.  His original narrative, "left out key elements, problems and solutions, and a clear beginning and ending."  G.M. also had word retrieval issues, which Ms. Seifert determined impacted his expressive language skills, both orally and in writing.

73.     Ms. Siefert's report was considered by the IEP team, attached to the IEP documentation, and incorporated into G.M.'s record.

 **HCPS Review of Ms. Seifert's Report and Additional Assessments by HCPS and IEP**

74.     On April 18 and 25, 2018, an IEP meeting was held to discuss the results of the independent speech/language evaluation and the HCPS additional testing.

75.     Ms. Nalepa concluded that there was sufficient data across multiple settings to diagnose G.M. with ADHD.

76.     In Ms. Nalepa's Supplemental Psychological Evaluation Report, she stated that in comparison to G.M.'s own cognitive profile as well as performance by same age peers, G.M. exhibits characteristics consistent with a deficit in Phonological Processing, including phonological awareness, phonological memory and rapid naming skills.

77.     The IEP Team reviewed an Educational Assessment Report produced by Michele Redmiles ("Ms. Redmiles"), a Special Education Teacher.

78.     In the interim between when Dr. Morrison conducted testing and Ms. Nalepa and Ms. Redmiles performed testing, G.M. had received specialized instruction through tutoring twice a week for approximately two months.

79.     The IEP Team assessed whether G.M. had a pattern of weaknesses on at least one of the identified categories, including oral expression, listening comprehension, written expression, basic reading skills, reading fluency skills, reading comprehension, mathematics calculation, and mathematics problem solving.

80.     At the IEP Meeting, with respect to written expression, Ms. P noted that Dr. Morrison had diagnosed G.M. with dyslexia and dysgraphia, that Ms. Seifert had concluded that G.M. had a weakness in oral expression adversely impacting his written expression, that his tutor had stated that G.M. has weaknesses in writing, that G.M. often refused to write at home, that writing samples from Ms. Clark's class showed that G.M. was not writing at all

or very minimally, that Ms. Clark had agreed that G.M. had a weakness in writing and that his writing was not comparable to his peers--all of which supported the conclusion that G.M. was not writing on grade level and was eligible for special education.

81.     Specifically, the IEP Meeting notes state that even though G.M. performed in the average range for the standardized assessments for written expression, he, "may not produce writing consistent with this day to day in the classroom. Ms. Clark feels there is a weakness in written expression based upon classroom observations and working closely with [G.M.]" and that G.M., "needs additional prompting support to display writing skills consistent with grade peers."

82.     On his 3rd Quarter report card, Ms. Clark noted that G.M. needed assistance to organize his thoughts and that when writing, he found it challenging taking risks and attending to accuracy and attention was still an issue.

83.     At the IEP Meeting, with respect to basic reading skills and reading fluency, Ms. P noted that Dr. Morrison had diagnosed G.M. with dyslexia, that his standardized test scores dropped significantly, that the parents observed his trouble reading at home, that Ms. Seifert had noted his inability to retell a story he had read in a logical or sequential order, and that his tutor had stated that he demonstrated weaknesses in all of the reading categories.

84.     Over G.M.'s parents' objections, the IEP Team determined that G.M. did not have a weakness in oral expression, written expression, basic reading skills, or reading fluency skills, did not have a specific learning disability, and did not qualify for special education.

85.     Over G.M.'s parents' objections, the IEP Team determined that G.M. had ADHD and was suffering an educational impact as a result of his ADHD, but that he did not

meet the criteria for the educational disability of Other Health Impaired and was not eligible for special education.

86.    As of the date of this IEP Meeting, five months into his second grade school year, G.M.'s highest recorded reading rate remained 57 wpm, well below the expectations **for first grade**.  However, this information was not provided to G.M.'s parents.

87.    HCPS agreed to provide additional testing regarding word retrieval.

### The June 13, 2018 IEP Meeting

88.    On June 13, 2018, an IEP meeting was held to discuss the results of the independent speech/language evaluation and the HCPS additional testing.

89.    HCPS speech/language pathologist, Ms. Taylor, evaluated G.M. for issues with word retrieval.

90.    Ms. Taylor's report was considered by the IEP team, attached to the IEP documentation, and incorporated into G.M.'s record.

91.    During testing, Ms. Taylor observed an excessive use of fillers (e.g. like, um), interjections, pauses, revisions, word/phrase repetitions, prolongations, and an irregular speech rate.

92.    Ms. Taylor found that these issues were attributable to G.M. needing additional time to formulate his thoughts.

93.    At the IEP Meeting, Ms. Taylor stated that typically, disfluencies occur less than 2% of the time, but G.M. exhibited disfluencies 10% of the time.

94.    Ms. Taylor concluded that G.M. has issues with language formulation and has difficulty following a sequential order.

95.    Ms. Taylor stated during the meeting and in her report that, without supports,

G.M. has a moderate impairment.

96.     Mrs. Taylor, however, found that the disfluencies and language formulation issues did not have an educational impact on G.M., relying solely on, "grades and standardized assessments" to make this determination.

97.     During the IEP meeting, Ms. P provided Ms. Taylor with writing samples that Ms. P had received from Ms. Clark throughout the year, the vast majority of which were completely blank.

98.     Ms. Taylor admitted that she had not reviewed any samples of G.M.'s written work before determining that there was no educational impact.

99.     On his 4th Quarter report card, Ms. Clark stated, "it was challenging attending to writing tasks", that G.M. required, "many reminders to initiate tasks and stay focused," needed help staying organized and completing work on time, and that many of his assignments were missing, incomplete or not turned in, "making it difficult to fully assess [his] abilities."

100.    During this meeting, Ms. P asked Ms. Clark how she could possibly assess whether G.M. was on grade for writing when he was not completing his assignments, or how she gave him a grade of "with assistance" on his report card when so many of his assignments remained blank.

101.    Ms. Clark conceded during the meeting that G.M.'s written responses were not typical for a second grader and that he was behind in writing.

102.    At the Due Process Hearing, Ms. Nalepa conceded that she is not the right person to assess whether a student is writing on grade level and deferred to his classroom teacher, Ms. Clark, who consistently had stated that G.M.was behind in writing.

103.    Ms. Clark also revealed that HCPS does not measure whether students are on grade level for writing in the second grade.

104.    As of the date of this IEP Meeting, at the end of his second grade school year, G.M.'s highest recorded reading rate was 62 wpm (70 wpm if one looks to a F&P assessment that was not included on G.M.'s Assessment Summary Form), below the expectations **for first grade**.  However, this information was not provided to G.M.'s parents.

105.    Additionally, G.M.'s fluency scores had dropped from 2's to 1's as his F&P levels increased and the majority of his fluency scores in second grade were 1's, demonstrating that reading rate was adversely affecting his fluency.  However, this information was not provided to G.M.'s parents.

106.    During this meeting, Ms. Clark again admitted that G.M. has a weakness in writing and that his written work is below that of other second grade students, observations that were entirely omitted from the Report.

107.    Ms. Clark stated that she had not sent home G.M.'s graded assignments and that he had produced some written work in response to those.

108.    Ms. P verbally requested copies of all of G.M.'s graded written assignments and confirmed her request that same day via email.

109.    Ms. P's letter further reiterated G.M.'s parents' intention to place G.M. at a private school at public expense and requested reimbursement.

110.    Despite her request on June 13, 2018, Ms. P had not received copies of G.M.'s graded assignment by July 6, 2018, and Ms. P stated that it was unclear whether the work she had received at the end of the year contained G.M.'s graded assignments.

111.　　On August 9, 2018, approximately two months after the request was made, Ms. Wadsworth provided a list of G.M.'s graded assignments.

112.　　Ms. P was able to locate some but not all of the assignments in the composition notebooks that had been sent home at the end of the school year.

### Private Placement at the Jemicy School

113.　　After G.M. was diagnosed by Dr. Morrison in January, 2018, G.M.'s parents applied to the Legacy School ("Legacy"), and the Jemicy School ("Jemicy"), both schools that specialize in meeting the needs of students with language-based learning disabilities and other challenges, such as dyslexia and dysgraphia.

114.　　Both Legacy and Jemicy require students to visit the school for a shadow day during the application process, and G.M. visited both schools; HCPS was aware that G.M.'s parents were exploring school options.

115.　　In March, 2018, G.M. was accepted by Jemicy.

116.　　G.M.'s parents decided to place him at Jemicy after HCPS denied G.M.'s eligibility for special education.

117.　　In an attempt to catch G.M. up and prevent summer learning loss, G.M.'s parents enrolled him. in Jemicy's five-week summer camp in June-July, 2018.

118.　　G.M.'s parents enrolled him at Jemicy for the 2018-19 school year for third grade.

119.　　Ms. P paid $28,750 for G.M. to attend Jemicy for the 2018-19 school year.

120.　　At Jemicy, G.M. receives specialized instruction each school day using the Orton-Gillingham methodology and Jemicy's specially designed scope and sequence.

121.　　G.M. also receives a daily "Skills class," at Jemicy, where he and one or two

other students have specialized instruction to build decoding skills.

122.    In the Fall of 2018 and Spring of 2019, Jemicy administered Jemicy's Lower-Middle School ("LMS"), Benchmark assessments, and G.M. showed progress in all but two categories.

123.    G.M.'s report cards from Jemicy indicate growth and that he is responding well to the specialized instruction and interventions used by Jemicy.

124.    Jemicy uses the Learning A-Z Benchmark System (also called Reading A-Z) ("A-Z"), which like F&P is a leveled reading system that correlates to grade level.

125.    As both witnesses for HCPS and G.M. testified at hearing, fluency measures accuracy, reading rate and expression (sometimes called prosody).

126.    The primary differences between the F&P used by HCPS and A-Z is that A-Z does not utilize books with pictures to assess students and A-Z has a target for both words correct per minute ("WCPM"), and accuracy while F&P measures accuracy to determine if the student is able to move to the next instructional level and measuring words per minute is optional and is not used to determine the instructional level.

127.    Jemicy began assessing G.M. at a first grade level to establish a baseline and during the 2018-19 school year, by the end of third grade, G.M. progressed from Level F to Level L, or a first grade level to a beginning-to-mid second grade level.

128.    At Jemicy, G.M. also received speech/language services from Patricia Galla, M.S., CCC-SLP for 45 minutes once a week during the 2018-19 school year and showed great progress, including but not limited to executive function issues, such as organization; retelling stories; listening and reading comprehension; expressive language and oral formulation; pronunciation of certain sounds; word retrieval; sentence structure and

grammatical forms, such as verb tenses.

129. In the Spring of 2019, Jemicy administered normed-based assessments, comparing G.M.'s performance to same-aged peers who took the same test.

130. At this time (mid-to-end of third grade), G.M.'s scores showed his performance at a beginning-to-mid second grade level (indicated by the "2A" for grade level), more than a year behind same aged peers.

131. Because G.M. still remained very behind in his decoding skills and fluency, and to prevent summer learning loss, G.M.'s parents again enrolled G.M. in Jemicy's five-week summer camp in June-July, 2019.

132. G.M.'s parents re-enrolled him at Jemicy for the 2019-20 school year for fourth grade and so notified HCPS.

133. Ms. P paid $35,000 for G.M. to attend Jemicy for the 2018-19 school year.

134. In the Fall of 2019, Jemicy administered Jemicy's Lower-Middle School ("LMS"), Benchmark assessments, and G.M. showed improvement in all but two areas, but actually dropped in areas if comparing Spring 2018 to Fall 2019, which Erin Gittings, Jemicy's LMS Coordinator of Language Services, stated was typical summer learning loss for children with dyslexia, even when they attend summer camp.

135. During the 2019-20 school year, at the beginning of fourth grade, Jemicy assessed G.M. at a Level K, which equates to a beginning second grade level, to establish a baseline after the summer.

136. As of G.M.'s parent/teacher conference on October 16, 2019, G.M. had progressed to a Level M and was assessed for a Level N, but did not meet the target reading rate, which equates to a beginning-to-mid second grade level.

137.    On March 26, 2019, G.M.'s parents filed a request for a Due Process Hearing regarding the HCPS determination that G.M. was ineligible for special education services.

138.    After receipt of the request for Due Process Hearing, HCPS requested to hold another IEP meeting to re-evaluate the determination that G.M. did not qualify as a student with a Specific Learning Disability or Other Health Impairment and was not eligible for special education, in light of information regarding G.M.'s academic performance at Jemicy.

139.    Ms. P agreed and provided data from Jemicy regarding G.M.'s academic performance.

140.    On June 18, 2019, HCPS held an IEP Meeting and Ms. P was accompanied by her counsel, Michael Eig, Dr. Vincent Culotta, Ph.D, ABN ("Dr. Culotta"), and Ms. Gittings (who participated by phone).

141.    Ms. Gittings explained the Jemicy data and answered questions posed by HCPS staff.

142.    Ms. Gittings stated that at the time of the meeting, which was the end of G.M.'s third grade school year, G.M. was at a mid-year second grade fluency level and was working at a Level L on A-Z.

143.    Ms. Gittings stated that G.M.'s working memory issues were affecting his fluency.

144.    Dr. Culotta, an expert in neuropsychology who conducts Independent Educational Assessments for a number of school systems, including HCPS, stated that he had met with Ms. P and G.M. and reviewed the outside assessments.  He told the IEP team that G.M. qualified for as a student with a specific learning disability and that HCPS had somehow

"missed" him.

145.    Dr. Culotta also agreed with Dr. Morrison's diagnosis of dyslexia and dysgraphia.

146.    Dr. Culotta noted G.M.'s family history with dyslexia, a strong indicator of a learning disability.

147.    Dr. Culotta also agreed that G.M. has difficulties with attention and confirmed that G.M. has ADHD and executive functioning difficulties related to attention and working memory.

148.    Dr. Culotta also explained that, taken together, all of these issues adversely impacted his ability to read and write.

149.    Dr. Culotta concluded that G.M.'s academic skills were significantly lower than expected given his cognitive ability.

150.    At the June 18th meeting, counsel then stated that Ms. P had been told by HCPS that G.M. did not qualify for an IEP because he was not at least one grade level behind, and that this one-year rule was not a requirement under the law.

151.    Counsel continued by noting that the Jemicy data showed that G.M. is more than one year below grade level in reading, as well as in writing.

152.    Counsel and Ms. P next requested that HCPS provide any and all documentation that G.M. had met grade-level standards in reading and writing for second grade prior to his being placed at Jemicy; the IEP Team took a break so that HCPS could pull together the data, which staff indicated was in boxes on the conference room floor.

153.    After approximately 40 minutes of waiting for data to be provided, Kathy Stump ("Ms. Stump"), Instructional Facilitator for Nonpublic Services and Special

Education Compliance, and the HCPS attorney, Manisha Kavadi ("Ms. Kavadi") told Ms. P that HCPS would need more time to provide the data, despite the fact that G.M.'s education records were in the IEP meeting room.

154.    HCPS and parents' counsel decided to end the meeting so that the documentation could be produced because counsel and Ms. P did not wish to proceed without being provided the documentation.  Ms. Stump agreed to send the data after the meeting.

155.    On June 24, 2019, counsel followed up by letter, requesting the documentation and after additional back and forth, on July 1, 2019, Ms. Stump finally sent the documentation.

156.    At no point during the IEP process, which spanned from October, 2017 through June, 2019, did HCPS provide the July 1, 2019 documentation or any of the underlying records regarding the F&P Benchmark Assessments to G.M's parents, or any information regarding G.M.'s reading rate or fluency scores.

157.    Ms. P argued throughout the IEP process, in person and by letter, that G.M. was not reading on grade level and that his reading rate was "slow and laborious," but was told by the IEP Team that there was no data to support her observations.

158.    Throughout the IEP process, HCPS had data that it had collected and chosen not to provide to G.M.'s parents, despite Ms. P's FERPA request on March 21, 2019, confirming beyond any question that G.M.'s reading rate was far below grade level expectations, according to the school system's F&P Benchmark Assessment System.

159.    On July 8, 2019, parents' counsel sent a letter to HCPS, stating that some of the disclosed data, specifically writing samples, were not G.M.'s at all and asked to be

provided with information regarding whether someone had scribed for G.M. or the writing samples belonged to another child; HCPS did not respond to this correspondence.

160.    In his July 8, 2019 letter, counsel also requested that HCPS direct him to each and every bit of data that support G.M.'s alleged on-grade level performance at HCPS.

161.    HCPS did not respond to this request, even though it had apparently already substantially produced a summary and analysis of this data, which was not provided to the parents until five days prior to the hearing.

162.    The HCPS data summary and analysis was prepared by Bianca Roberts, ("Ms. Roberts") Resource Teacher K-8 Instruction, and other HCPS staff.

163.    The HCPS data summary and analysis contained information that had not previously been shared with Ms. P.

164.    The HCPS data summary and analysis contained the Maryland State Standards for 2nd grade and provides analysis of G.M.'s performance in multiple areas, as it relates to the State standard.

165.    The creation of the HCPS data summary and analysis was not explained by HCPS until several days into the due process hearing and after petitioners had rested their case.

### The Due Process Hearing

166.    A due process hearing was convened on October 15, 16, and 17, 2019 and on November 1, 15 and 19, 2019.

167.    The parents presented expert testimony from Erin Gittings, as an expert in special education at Jemicy School.

168.    The parents also presented expert testimony from Dr. Vincent Culotta, an

expert in Neuropsychology. Dr. Culotta offered his opinion based on his thirty (30) years of practice in the field.

169. The parents presented expert testimony from Lisa Taylor, an expert in special education with an emphasis on reading. Ms. Taylor offered her testimony based on her thirty (30) years of experience working with children with dyslexia, teaching reading, and her extensive training in Orton Gillingham. Ms. Taylor was the only expert witness to testify at the trial who was qualified in reading.

170. Despite clear evidence to the contrary, the school system witnesses testified that reading fluency only matters for a student insofar as it impacts reading comprehension.

### The Due Process Decision

171. The ALJ issued her decision on December 26, 2019.

172. The ALJ found in favor of the school system, denying the parents all requested relief.

173. The ALJ ignored evidence from both sides, including testimony from G.M.'s HCPS teacher that G.M. was not writing on grade level.

174. The ALJ acknowledged that G.M.'s reading fluency was below age expectation, but ignored the impact of the deficit on G.M. instead agreeing with the school system as to its need to impact comprehension.

175. The ALJ ignored the evidence from Jemicy showing that G.M. was significantly below grade level when he began in the program.

176. The ALJ ignored the school system's failure to provide G.M.'s mother with parental participation in the IEP process.

177. The ALJ erroneously found that Orton Gillingham is not specially designed

instruction, despite guidance from the state indicating otherwise.

178. The ALJ erred in discounting the testimony from the parent as well as her witnesses.

179. The ALJ gave blind deference to the school system witnesses, despite countervailing contemporaneous written records produced by the school system.

180. The ALJ's decision contains multiple errors of fact and law.

181. The ALJ's findings of fact are not regularly made.

182. The ALJ applied incorrect legal standards in reaching her Decision.

183. The parents are aggrieved by the ALJ's decision.

184. The plaintiffs have exhausted their administrative remedies.

## COUNT I

185. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 184.

186. Defendants' failure to find G.M. eligible for special education and related services violates plaintiffs' rights under the IDEA and Maryland law.

## COUNT II

187. Plaintiffs incorporate as though restated each of the factual allegations stated in paragraphs 1 through 186.

188. The ALJ committed error, and violated plaintiffs' due process rights under the IDEA and Maryland law by failing to engage in regular fact finding or render a proper decision based on an accurate and impartial understanding of the facts and law.

### PRAYER FOR RELIEF

WHEREFORE, plaintiffs respectfully request that this Court:

1.  Issue judgment for plaintiffs and against defendants;

2.  Issue declaratory relief that defendants violated plaintiffs' rights under applicable law;

3.  Issue injunctive relief, vacating the decision of the ALJ and ordering defendants to find G.M. eligible for special education.

4.  Order defendants to reimburse plaintiffs for the costs associated with enrolling G.M. at Jemicy for the 2018-19 and 2019-20 school years, including payment for the cost of transportation, related services and necessary summer educational services, to place and fund G.M. at Jemicy for the remainder of the 2019-20 school year and declare it to be his current educational placement under the IDEA;

5.  Order defendants to pay plaintiffs' reasonable attorneys' fees and costs, including the fees and costs of this action; and

6.  Award any other relief that this Court deems just.

Respectfully Submitted,

_____/s/_____ _____
Michael J. Eig            #07718
Paula A. Rosenstock     #09798
MICHAEL J. EIG AND ASSOCIATES, P.C.
5454 Wisconsin Avenue
Suite 760
Chevy Chase, Maryland 20815
(301) 657-1740
Counsel for Plaintiffs