IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| G.M., *et al.*, | * | |
| Plaintiffs, | * | |
| v. | * | |
| | | CIVIL NO. JKB-20-0791 |
| MICHAEL J. MARTIRANO, *et al.*, | * | |
| Defendants. | * | |

\* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM

After Administrative Law Judge ("ALJ") Michelle W. Cole affirmed a Howard County school's refusal to grant accommodations that third-grade student G.M.'s parents requested under the Individuals with Disabilities Education Improvement Act ("IDEA"), G.M.'s parents brought this suit challenging Judge Cole's decision. (Compl., ECF No. 1.) G.M. and his parents (collectively, "Plaintiffs") filed a Motion for Summary Judgment (ECF No. 15) with this Court, as did the Howard County Board of Education and Dr. Michael J. Martirano (collectively, "Defendants") (ECF No. 18). Both motions are fully briefed, and no hearing is required. *See* Local Rule 105.6 (D. Md. 2018). For the reasons set forth below, the Court DENIES Plaintiffs' motion and GRANTS Defendants' motion.

### I.  The Individuals with Disabilities Education Improvement Act

In enacting the IDEA, Congress recognized that disability is a "natural part of the human experience" and that "[i]mproving educational results for children with disabilities is an essential element of our national policy of ensuring equality of opportunity, full participation, independent living, and economic self-sufficiency for individuals with disabilities." 20 U.S.C. § 1400(c)(1). The IDEA provides federal funding to states that develop policies and procedures to ensure that

1

children who are deemed "disabled" have access to a free appropriate public education ("FAPE"), which is "an educational program reasonably calculated to enable a child to make progress appropriate in light of the child's circumstances." *Id.* § 1412(a); *Endrew F. ex rel. Joseph F. v. Douglas Cnty. Sch. Dist. RE-1*, 137 S. Ct. 988, 999 (2017).

Maryland's implementing regulations set forth specific criteria for determining whether a student has a disability and what a FAPE should entail. *See* Md. Code Ann., Educ. §§ 8-401 *et seq.*; Md. Code Regs. 13A.05.01.01 *et seq.* These determinations are made by an individualized education program ("IEP") team, which is "a group of individuals responsible for . . . [i]dentifying and evaluating students with disabilities" and then developing IEPs for those students. Md. Code Regs. 13A.05.01.03(35). An IEP is "a written statement for a student with a disability that is developed, reviewed, and revised" in accordance with the IDEA's substantive requirements. 20 U.S.C. § 1401(14). A school system "must conduct a full and individual initial evaluation" to ascertain whether a child has a disability before beginning to provide "special education and related services to a child." 34 C.F.R. 300.301(a).

In pertinent part, the IDEA defines a "child with a disability" as a child with "(i) . . . other health impairments, or specific learning disabilities; and (ii) who, by reason thereof, needs special education and related services." 20 U.S.C. § 1401(3)(A); *see also* Md. Code Ann., Educ. § 8-401(a)(2).

An "other health impairment" ("OHI") is defined as "having limited strength, vitality, or alertness, including a heightened alertness to environmental stimuli, that results in limited alertness with respect to the educational environment," that is (1) "due to chronic or acute health problems," including ADD and ADHD, and that (2) "[a]dversely affects a child's educational performance." 34 C.F.R. § 300.8(9).

As for a "specific learning disability" ("SLD"), an IEP team may determine that one is present when:

> "The child does not achieve adequately for the child's age or to meet State-approved grade-level standards in one or more of the following areas, when provided with learning experiences and instruction appropriate for the child's age or State-approved grade-level standards: (i) Oral expression; (ii) Listening comprehension; (iii) Written expression; (iv) Basic reading skill; (v) Reading fluency skills; (vi) Reading comprehension; (vii) Mathematics calculation; [and] (viii) Mathematics problem solving."

34 C.F.R. § 300.309(a)(1); Md. Code Regs. 13A.05.01.06(D)(2). In making that determination, an IEP team may consider whether the student (1) "[d]oes not make sufficient progress to meet age or State-approved grade-level standards" in core subject areas, and (2) "[e]xhibits a pattern of strengths and weaknesses in performance, achievement, or both, relative to age, State-approved grade-level standards, or intellectual development." Md. Code Regs. 13A.05.01.06(D)(2)-(3).

Second, a "child with a disability" must "need[] special education and related services" as a result of his or her condition. 20 U.S.C. § 1401(3)(A). Maryland regulations define "specially designed instruction" as a means of adapting "the content, methodology, or delivery of instruction" to "address the unique needs of the child that result from the child's disability" and to "ensure access of the child to the general curriculum, so that the child can meet the educational standards within the jurisdiction of the public [educational] agency that apply to all children." 34 C.F.R. § 300.39(b)(3).

## II. Background[1]

G.M. was a nine-year-old Howard County Public Schools ("HCPS") student at the time of the parties' Due Process Hearing before Judge Cole. (J. Cole Decision, OAH No. MSDE-HOWD-OT-19-22166, ¶ 1.) G.M. attended HCPS's Centennial Lane Elementary School ("Centennial")

---

[1] The facts described in this section are largely based on Judge Cole's findings of fact. As discussed in Part IV.A, *infra*, Judge Cole's findings of fact were regularly made, and are thus entitled to deference.

from kindergarten through second grade and transferred to the Jemicy School ("Jemicy"), "an independent private day school for children with language-based learning differences," before starting third grade. (*Id.* ¶¶ 1, 97.)

In kindergarten, G.M. experienced difficulties with paying attention, sitting still, and controlling impulses. (*Id.* ¶ 2.) In first grade, G.M. "continued to have problems with attention requiring frequent redirection, repetition of directions, and reminders to stay on task." (*Id.* ¶ 7.) G.M.'s teachers employed a variety of strategies, including fidgets, a timer, and a daily checklist for behaviors, to address his difficulties with paying attention. (*Id.* ¶¶ 2, 8.)

Despite these difficulties, G.M. understood concepts across a variety of subjects, clearly communicated ideas verbally, displayed reading comprehension, met grade-level math standards, "and was given more rigorous math instruction." (*Id.* ¶¶ 3, 9–10.) When writing, however, G.M. "tended to rush his work and make errors in spelling, punctuation, and grammar." (*Id.* ¶ 9.) Although G.M. required some assistance with reading comprehension toward the end of first grade, G.M. reportedly met grade-level "expectations for capitalization and punctuation in language arts and was able to meet the expectations for spelling and learning basic math facts with assistance." (*Id.* ¶ 10.)

In second grade, G.M. still experienced difficulties with "listening to directions, sitting still, and staying quiet in class," and he "was disorganized and failed to complete his work." (*Id.* ¶ 12.) In the fall of that year, G.M. took Maryland's annual Measuring Academic Progress ("MAP") assessment by reading the text himself, rather than having it read to him, which occurs prior to second grade. (*Id.* ¶ 14.) Although G.M.'s percentile score was lower in second grade than in prior years, he nonetheless received average scores on the MAP's language arts and math sections. (*Id.* ¶ 15.) Around that time, however, G.M.'s "reading and writing abilities were

4

inconsistent" and he "required significant assistance to complete his work, especially in writing." (*Id.* ¶ 17.) After talking to G.M.'s teacher, G.M.'s mother requested that G.M. receive testing for Attention Deficit Disorder ("ADD") and Attention Deficit Hyperactivity Disorder ("ADHD"). (*Id.* ¶¶ 18–20.)

On November 15, 2017, HCPS staff discussed G.M.'s academic performance with his parents at an IEP meeting held pursuant to the IDEA. Based on this discussion, "HCPS staff did not suspect the Student of having a disability under the IDEA," and instead recommended consultations with specialists to address G.M.'s behavioral and reading difficulties. (*Id.* ¶¶ 22–24.) These specialists recommended various interventions, including a pencil grip, weighted vest, wiggly chair, and timer. (*Id.* ¶¶ 27, 29.) Around that time, G.M.'s parents hired psychologist Dr. Julie Morrison to evaluate G.M. (*Id.* ¶ 30.) Dr. Morrison diagnosed G.M. with dyslexia, "a language-based learning disability rooted in phonological processing that impacts reading and writing skills," as well as dysgraphia, "a learning disability involving written language." (*Id.* ¶ 39.)

On February 13, 2018, after reviewing Dr. Morrison's report, HCPS staff held another IEP meeting. (*Id.* ¶¶ 44–45.) This group of staff—also known as the school's "IEP team"—recommended additional interventions, but rejected Dr. Morrison's conclusions because they were inconsistent with G.M.'s performance on formal and informal assessments. (*Id.* ¶¶ 47–48.) G.M.'s parents then hired speech-language pathologist Deena Seifert, who performed a Speech-Language Evaluation on G.M. and diagnosed him with a Mixed Expressive/Receptive Language Disorder. (*Id.* ¶¶ 50–65.) When G.M.'s teacher informally assessed his phonological awareness in the classroom, however, G.M. received nearly perfect scores. (*Id.* ¶ 66.) After reviewing the record, Judge Cole found that G.M. "clearly . . . has dyslexia and ADHD" (*id.* at 38), so the Court will consider these two diagnoses in its analysis below.

In March 2018, G.M. took a number of assessments at Centennial, and received average scores on a range of metrics. (*Id.* ¶¶ 67–73.) However, G.M. received elevated scores on a test measuring his "restlessness, impulsivity, inattention, and hyperactivity," and he was observed engaging in off-task behavior during class. (*Id.* ¶¶ 74–75.)

On April 18, 2018, the IEP team concluded that G.M. did not have a "specific learning disability" ("SLD") under the IDEA because he "achieved adequately for his age, met State-approved grade level standards, and did not require specialized instruction." (*Id.* ¶ 78.) The IEP team also "determined that there was an adverse impact on the Student's educational performance due to his ADHD," but concluded that G.M.'s ADHD did not qualify him for special education because he "did not require reteaching or specially designed instruction in order to maintain a similar rate of progress as his same-age peers." (*Id.* ¶ 79.)[2]

From January through June 2018, G.M. was tutored twice a week. (*Id.* ¶ 91.) He scored higher than projected on his spring 2018 MAP test, received average scores on speech-language assessments administered at Centennial, displayed clear communication and reading skills, read grade-level texts, "met the second grade expectation for capitalization and punctuation in language arts, and was able to meet the expectations for spelling and learning basic math facts with assistance." (*Id.* ¶¶ 83–92.) G.M., however, still displayed difficulties with paying attention and exercising self-control. (*Id.* ¶ 94.) His parents rejected some interventions that the IEP team proposed at its last meeting of the school year, and instead enrolled G.M. at Jemicy for a summer camp, and subsequently for his third-grade school year.[3]

---

[2] The IEP team met again on April 25, 2018 to review additional assessments and reached the same conclusion. (J. Cole Decision ¶¶ 80–82.)

[3] G.M. was accepted into Jemicy in February 2018, around the time when Dr. Morrison diagnosed GM, then a second-grade student, with dyslexia and dysgraphia. (*Id.* ¶¶ 41, 43.)

Jemicy uses the Orton-Gillingham methodology, "a structured, multi-sensory approach to teaching language," in all subject areas. (*Id.* ¶¶ 98–99.) This teaching methodology is also available in public schools, and Jemicy's teachers are not required to have certifications in special education. (*Id.*) Before beginning third grade, G.M. began taking ADHD medication, and he subsequently "showed an improvement in problem behaviors." (*Id.* ¶ 104.) According to Plaintiffs, "G.M.'s report cards from Jemicy indicate growth and that he is responding well to the specialized instruction and interventions used by Jemicy." (Compl. ¶ 123.) G.M.'s mother allegedly paid $28,750 for G.M.'s third-grade year at Jemicy and sought reimbursement for this tuition from HCPS. (*Id.* ¶¶ 109, 119.)

On March 26, 2019, Plaintiffs requested a Due Process Hearing to challenge HCPS's finding that G.M. does not have a disability, and thus is ineligible for special education under the IDEA. (*Id.* ¶ 137.) The parties were allegedly unable to resolve this dispute during a final IEP team meeting held on June 19, 2019. (*Id.* ¶ 138.) During this meeting, Plaintiffs allegedly "requested that HCPS provide any and all documentation that G.M. had met grade-level standards in reading and writing for second grade," but HCPS allegedly refused to provide that data. (*Id.* ¶¶ 152–53.) HCPS ultimately produced that data, but Plaintiffs allege that a procedural violation occurred because "the HCPS data summary and analysis was not explained by HCPS until several days into the Due Process Hearing and after petitioners had rested their case." (*Id.* ¶ 165.)

Judge Cole conducted a Due Process Hearing in October and November 2019 and found in favor of HCPS on December 26, 2019. (*Id.* ¶¶ 166, 171–72.) In their Complaint, Plaintiffs argue that Judge Cole's substantive findings and conclusions were incorrect, and that Judge Cole "ignored the school system's failure to provide G.M.'s mother with parental participation in the IEP process." (*Id.* ¶¶ 173–82.)

7

## III. Legal Standards

A "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing predecessor to current Rule 56(a)). The "mere existence of a scintilla of evidence in support of the [nonmoving party's] position" is insufficient to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). The facts themselves, and the inferences to be drawn therefrom, must be viewed in the light most favorable to the party opposing summary judgment. *Scott v. Harris*, 550 U.S. 372, 378 (2007); *Iko v. Shreve*, 535 F.3d 225, 230 (4th Cir. 2008). Even so, the opponent may not rest upon the mere allegations or denials of his pleading, but must instead, by affidavit or other evidentiary showing, set out specific facts showing a genuine dispute for trial. Fed. R. Civ. P. 56(c)(1). Supporting and opposing affidavits must be made on personal knowledge with such facts as would be admissible in evidence and must affirmatively show the competence of the affiant to testify to the matters stated therein. Fed. R. Civ. P. 56(c)(4).

When faced with cross-motions for summary judgment in the IDEA context, a court must conduct a modified *de novo* review of the administrative record, giving "'due weight' to the underlying administrative proceedings." *MM ex rel. DM v. Sch. Dist. of Greenville Cnty.*, 303 F.3d 523, 530–31 (4th Cir. 2002). If an ALJ's findings of fact are regularly made and supported by evidence, they are considered *prima facie* correct. *Doyle v. Arlington Cnty. Sch. Bd.*, 953 F.2d 100, 105 (4th Cir. 1991). By contrast, if a finding of fact is "reached through a process that is far from the accepted norm of a fact-finding process," it is not "regularly made" and not entitled to a presumption of correctness. *Cnty. Sch. Bd. of Henrico Cnty., Va. v. Z.P. ex rel. R.P.*, 399 F.3d 298, 305 (4th Cir. 2005).

An ALJ's determinations regarding witnesses' credibility are likewise entitled to deference. *Z.P.*, 399 F.3d at 307. Although a court must base its decision to grant relief on the preponderance of the evidence, 20 U.S.C. § 1415(i)(2)(C)(iii), a court must not substitute its own notions of sound educational policy for those of professional educators. *Hartmann ex rel. Hartmann v. Loudoun Cnty. Bd. of Educ.*, 118 F.3d 996, 999, 1005 (4th Cir. 1997); *see also N.P. by S.P. v. Maxwell*, 711 F. App'x 713, 718 (4th Cir. 2017) (quoting *A.B. ex rel. D.B. v. Lawson*, 354 F.3d 315, 327 (4th Cir. 2004) ("[I]f a district court is going to disagree with regularly made factual findings, then it must 'explain how it, despite the fact that it was reviewing a cold record, reached a conclusion completely contrary to that of the ALJ, who conducted the proceedings.'").

In these proceedings, "the party challenging the ALJ's decision bears the burden of showing that the decision was erroneous." *Spielberg v. Henrico Cnty. Pub. Sch.*, 853 F.2d 256, 258 (4th Cir. 1988).

### IV. Analysis

In IDEA cases, a federal court's review of an ALJ's decision is constrained by deferential standards of review. Because Judge Cole, who presided over the parties' Due Process Hearing, adhered to a normal process in arriving at her decision, this Court will base its *de novo* review of substantive legal issues on Judge Cole's findings of fact and assessments of witnesses' credibility.

#### A. Degree of Deference to Judge Cole

As a preliminary matter, Plaintiffs argue that Judge Cole's findings of fact and assessments of witnesses' credibility are not entitled to deference because they were not regularly made. (Pl. Mot. Summ. J. Mem. Supp. at 16, ECF No. 15-1.) As discussed in Part III, *supra*, a reviewing court will treat an ALJ's findings of fact as being *prima facie* correct as long as they were "regularly made," or made through a procedure resembling "the accepted norm of a fact-finding

9

process." *Z.P.*, 399 F.3d at 305. Courts interpret this requirement rather liberally. *See J.P. ex rel. Peterson v. Cnty. Sch. Bd. of Hanover Cnty.*, 516 F.3d 254 (4th Cir. 2008) (holding that an ALJ's findings were regularly made because "the hearing officer by all indications resolved the factual questions in the normal way, without flipping a coin, throwing a dart, or otherwise abdicating his responsibility to decide the case"). Similarly, an ALJ's "implicit credibility assessments 'are as entitled to deference under *Doyle* as explicit findings.'" *Id.* at 261 (citing *Z.P.*, 399 F.3d at 307).

In this case, Judge Cole considered extensive evidence, including technical assessments conducted by both parties' expert witnesses, in making her findings of fact. (*See* J. Cole Decision at 3–6.) Nothing about her multi-day hearing or fifty-three-page written decision reflects an arbitrary, unreasonable process akin to flipping coins or throwing darts. Moreover, Plaintiffs do not point to any irregularities in Judge Cole's factfinding process, and there is no reason to conclude that her findings were not regularly made.

Further, Judge Cole provides a logical explanation for assigning more weight to Defendants' expert witnesses: "HCPS witnesses have direct knowledge of the Student, his achievement and behavior, and the process followed by HCPS," whereas the Parents' witnesses "have little direct knowledge of the Student." (J. Cole Decision at 35.) One of Plaintiffs' expert witnesses was hired to spend only one hour with G.M., while another was hired to provide expert testimony, but never actually met G.M. (*Id.*) Given that this Court was not present at the Due Process Hearing—and thus was unable to fully assess or cross-examine the expert witnesses—the Court will, in keeping with Fourth Circuit precedents, defer to Judge Cole's credibility assessments.

### B. G.M.'s Eligibility Determination under the IDEA

Once this Court defers to Judge Cole's findings of fact and assessments of credibility, it becomes difficult for Plaintiffs to meet their burden of proving that Judge Cole erred in concluding that G.M. does not have a "disability" under the IDEA. *See Spielberg*, 853 F.2d at 258. Although the parties agree that G.M. has dyslexia and ADHD, they disagree over whether those conditions fit within the IDEA's definition of a disability. The Court will begin by considering whether G.M.'s dyslexia qualifies as an SLD and whether his ADHD qualifies as an OHI.

Under Maryland regulations, a student has an SLD when he or she displays academic achievement that falls short of state-level standards or exhibits a discernible pattern of strengths and weaknesses. *See* Part I, *supra.* Judge Cole agreed with HCPS's determination that G.M.'s dyslexia does not fit within the definition of an SLD. Judge Cole found that G.M. scored average or above average on many assessments at Centennial. By the end of second grade, G.M. was receiving average MAP scores, reading on grade level, and meeting grade-level standards in math. On the whole, Judge Cole's regularly made factual findings indicate that G.M. was meeting grade-level standards, and his academic performance was not reflecting a discernible pattern of strengths and weaknesses. *See* Md. Code Regs. 13A.05.01.06(D)(2)-(3); *see also E.P. By and Through J.P. v. Howard Cnty. Pub. Sch. Sys.*, Civ. No. ELH-15-3725, 2017 WL 3608180, at *35–*36 (D. Md. Aug. 21, 2017) (affirming an ALJ's determination that a child with ADHD lacked an SLD when the child was "achieving at grade level"). Accordingly, the Court agrees with Judge Cole's determination that G.M.'s dyslexia does not constitute an SLD.

In contrast, G.M.'s ADHD does fall within the definition of an OHI. To have an OHI, G.M. must experience (1) "chronic or acute health problems," such as ADHD, and his health problems must (2) "[a]dversely affect[] [his] educational performance." 34 C.F.R. § 300.8(9). In

11

this case, both parties agree that G.M. has ADHD and his ADHD adversely impacts his educational performance (J. Cole Decision ¶ 79), but they disagree about whether he needs special education. (*See* Pl. Mot. Summ. J. Mem. Supp. at 35–36; Def. Mot. Summ. J. Mem. Supp. at 39–48, ECF No. 18-1.) Because G.M. meets the first part of the definition of a "child with a disability"—namely, he has an OHI—the Court will next consider whether G.M. satisfies the second part of that definition—which requires that he "need[] special education and related services." *See* 20 U.S.C. § 1401(3)(A).

In arguing that G.M. lacks a disability, Defendants point to Fifth Circuit precedents holding that children who are progressing academically in regular classroom settings do not need special education. (*See* Def. Mot. Summ. J. Mem. Supp. at 12 (citing *William V. v. Copperas Cove Indep. Sch. Dist.*, 774 F. App'x 253, 254 (5th Cir. 2019).) Under this standard, G.M. appears to not need special education because, while in a regular classroom setting at Centennial, he received average scores on his assessments and showed improvement across various academic metrics. According to Judge Cole, HCPS's witnesses "agreed that, *notwithstanding problem behaviors*, the Student was making progress comparable to same age peers and meeting the State-approved grade-level standards for a second grade student in HCPS." (J. Cole Decision at 51 (emphasis added).)

Plaintiffs cite a District of Maryland decision clarifying that special education can include support for students who are "otherwise intellectually capable of mastering a general education curriculum through the delivery method used in a regular classroom." *Bd. of Educ. of Montgomery Cnty. v. S.G.*, Civ. No. DKC-2005-0323, 2006 WL 544529, at *14 (D. Md. Mar. 6, 2006). In that case, the court agreed with an ALJ's conclusion that a schizophrenic child needed special education services because her emotional disturbances prevented her from remaining in her regular classroom setting. *Id.* at *16. Despite invoking a more expansive definition of special education,

Plaintiffs do not meet their burden of proving that G.M.'s condition—which does not prevent him from remaining in his regular classroom—falls within that definition. *See Spielberg*, 853 F.2d at 258.

This Court's analysis is constrained by Judge Cole's assignment of greater weight to the views espoused by Defendants' expert witnesses, who testified that the interventions HCPS used to address G.M.'s ADHD were not "specially designed instruction or special education services," and that G.M. "did not require specially designed instruction to access his general education curriculum." (J. Cole Decision at 49.) Moreover, the Orton-Gillingham methodology does not necessarily constitute specially designed instruction, and Jemicy's teachers do not necessarily have certifications in special education. (*Id.* ¶¶ 98–99.) Thus, Plaintiffs' assertion that G.M.'s academic performance has improved at Jemicy lends support to the conclusion—reached by Defendants' expert witnesses and Judge Cole alike—that G.M. does not need special education services under the IDEA.

Thus, G.M. lacks a disability under the IDEA because G.M. does not have an SLD, and does not need special education services for his OHI of ADHD. *See* 20 U.S.C. § 1401(3)(A). Accordingly, Plaintiffs do not qualify for reimbursement of G.M.'s tuition at Jemicy.

### C. Judge Cole's Alleged Procedural Violation

Plaintiffs also argue that Judge Cole committed a procedural violation when she refused to consider Plaintiffs' argument that HCPS's IEP team "denied G.M's parents their right to meaningful participation in the IEP process."[4] (Pl. Mot. Summ. J. Mem. Supp. Mem. Supp. at 41, 45–46.) Judge Cole declined to consider this argument because Plaintiffs did not raise it in their due process complaint. (*Id.*)

---

[4] Specifically, Plaintiffs allege that the IEP team improperly delayed in providing G.M.'s parents with an analysis of his academic performance. (Pl. Mot. Summ. J. Mem. Supp. at 41).

13

This Court need not determine whether Judge Cole's refusal to consider the parental participation issue constituted a procedural violation because Plaintiffs do not prove that it altered Judge Cole's substantive conclusions. A "procedural violation must have caused substantive harm" to serve as grounds for relief. *T.B. v. Prince George's Cnty. Bd. of Educ.*, 897 F.3d 566, 573 (4th Cir. 2018) (internal citation omitted) ("A procedural violation of the IDEA may not serve as the basis for recovery unless it 'resulted in the loss of an educational opportunity for the disabled child'").

Plaintiffs provide no evidence showing that if Judge Cole had considered whether HCPS violated G.M.'s parents' right to meaningful participation, G.M. would have been deemed to have a disability requiring the provision of a FAPE. Because this causal requirement is not met, Judge Cole's alleged procedural error is harmless, and thus does not entitle Plaintiffs to relief under the IDEA.[5]

V. **Conclusion**

For the foregoing reasons, an order shall enter denying Plaintiffs' Motion for Summary Judgment (ECF No. 15) and granting Defendants' Motion for Summary Judgment (ECF No. 18).

DATED this 4 day of February, 2021.

BY THE COURT:

_____
James K. Bredar
Chief Judge

---

[5] Regardless, it is very unlikely that Defendants' actions would have been deemed a procedural violation of the IDEA, as they would have to "significantly impede[] the parents' opportunity to participate in the decisionmaking process regarding the provision of a [FAPE] to the parents' child." *R.F. By and Through E.F. v. Cecil Cnty. Pub. Sch.*, 919 F.3d 237, 248–49 (4th Cir. 2019) (citing 20 U.S.C. § 1415(f)(3)(E)(ii)(II)) (holding that a school system's destruction of academic data about a student did not rise to the level of a procedural violation under the IDEA).

14